# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SUSAN M. WENTZ,

      Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

No. 13 C 8903

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Susan Wentz filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. [1] *York v. Massanari*, 155 F.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). Craft v. Astrue, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB

Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to per-

form "any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a

disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir.

2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to

a finding that the claimant is disabled. A negative answer at any point, other than

Step 3, ends the inquiry and leads to a determination that a claimant is not disa-

bled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of

proof is on the claimant through step four; only at step five does the burden shift to

the Commissioner." *Clifford*, 227 F.3d at 868.

---

and SSI, the processes of evaluation are identical in all respects relevant to this case."). Ac-
cordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on April 26, 2011, alleging that she became disabled on July 18, 2009, because of multiple sclerosis, brain tumor, anxiety, and depression. (R. at 23, 186). She later amended, through counsel, the onset date to July 1, 2011. (*Id.* at 23, 47, 163). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 23, 92–96, 102–08). On November 5, 2012, Plaintiff, represented by an attorney, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 23, 48–78). The ALJ also heard testimony from Jay Elmahassni, Plaintiff's husband, and from GleeAnn L. Kehr, a vocational expert (VE). (*Id.* at 23, 48–78, 132).

Three weeks later on November 29, 2012, the ALJ denied Plaintiff's request for benefits. (R. at 23–38). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since July 1, 2011, the onset date. (*Id.* at 25). At step two, the ALJ found that Plaintiff's multiple sclerosis, pituitary tumor, migraine headaches, obesity post gastric bypass surgery, hypertension, and cervical spondylosis are severe impairments. (*Id.*). The ALJ determined that Plaintiff's "medically determinable mental impairments of adjustment disorder with anxiety does not cause more than minimal limitations in [her] ability to perform basic mental work activities and is therefore non-severe." (*Id.* at 26). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 27–28).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform light work except she is "unable to climb ladders, ropes or scaffolds; she is not to drive as part of her work duties; she is able to occasionally operate foot controls; and she is able to occasionally handle and finger with her right dominant upper extremity." (R. at 29). At step four, the ALJ determined that Plaintiff could perform past relevant work as a dietary consultant. (*Id.* at 36). Alternatively, based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including rental clerk, counter clerk, and usher. (*Id.* at 37–38). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.* at 38).

The Appeals Council denied Plaintiff's request for review on November 6, 2013. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." Craft, 539 F.3d at 675–76.

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the

ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

### A. Treating Physicians

In March 2009, Plaintiff began treating with Jean Walsh, D.O. (R. at 240). She was referred to a neurology consult for migraines. (R. at 241). In April, she returned with a cough and nausea and also complained of "blurred vision and visual disturbance lasting up to 2 minutes . . . where everything was cloudy and pupils were constricted." (*Id.*at 243). She reported a migraine the day prior but denied "any general weakness." (*Id*).

In May 2009, Plaintiff saw Arthur Itkin, M.D., a neurologist. He described Plaintiff as a woman with "multiple sclerosis with at least two clinical attacks with ancillary studies supporting the diagnosis." (R. at 303). He recommended that she continue Rebif for MS and Topamax and Imitrex for migraines.[3] (*Id.*). An ECG conducted on June 10, 2009, reported a "new lesion in the left parietal lobe" and report-

---

[3] Rebif (interferon beta-1a) is used to treat relapsing multiple sclerosis (MS). Topamax (topiramate) is a seizure medicine, which is also used to prevent migraine headaches. Imitrex (sumatriptan) is a headache medicine that is used to treat migraine headaches and cluster headaches. <www.drugs.com>

ed an "episode of speech problem very transiently with severe headache." (*Id.* at 257). Plaintiff continued with Topamax for headache control. (*Id.*)

From July 14–17, 2009, Plaintiff was hospitalized with bilateral vision changes, left hand cramping and numbness, and gait instability. (R. at 263). Her treating neurologist was Yvonne M. Curran, M.D. An MRI of Plaintiff's spine was conducted with unremarkable results. An MRI of her brain located a new large lesion in the left internal capsule. (*Id.* at 317). She was discharged with IV steroids, Topamax, and Imitrex for migraines. (*Id.* at 263).

In October 2009, she called Dr. Itkin, her neurologist, to complain about constant foot and ankle cramping, lasting three days, from October 11–13. (R. at 299). In November 2009, she complained about severe burning at the injection cite for the Rebif and explained that she was reluctant to continue with the injections. (*Id.* at 298).

In March 2010, she had a follow-up brain MRI with contrast. (R. at 268–69, 314–16). A new single lesion "within the deep white matter" was reported, otherwise there were no additional lesions present. (*Id.*) On June 25, 2010, Plaintiff complained of a headache at the back of her neck that had lasted for two weeks. (*Id.* at 250).

On April 29, 2011, Plaintiff called Dr. Itkin and complained about numbness in her arms and legs for "several weeks, [and her] hands [are] weak." (R. at 297). On May 17, 2011, he summarized her follow-up exam after a year hiatus noting: "[s]he has now started complaining of numbness for several weeks in the hands and

cramping in the hands as well." (*Id.* at 301). He noted Tinel's sign[4] over the median nerve at the wrist and stated "clearly her proximal extremity intermittent weakness and fatigue is troublesome. . . . It is most likely we are dealing with a multiple sclerosis exacerbation." (*Id.*). Dr. Itkin then noted that although Plaintiff was interested in going on Gilenya,[5] she did not have any insurance. He gave her two weeks of steroids and wrote in a note to the referring physician that "we will go from there." (*Id.*) On May 24, 2011, she complained to Dr. Itkin that the steroid, prednisone, was keeping her up at night. (*Id.* at 295). On May 25, 2011, Plaintiff underwent an EMG of the upper extremities which ruled out carpel tunnel. (*Id.* at 461–63).

Her June 2011 spinal MRI showed "mild spondylotic changes with low grade stenosis of the left C5 and C6 neural foramina." (R. at 313). Furthermore, on June 8, 2011, Dr. Itkin noted "degenerative changes in [her] neck." (*Id.*).

While Plaintiff was treating with her neurologist, she was also treating with her internist, Dr. Walsh. In April 2011 she went to Dr. Walsh complaining of fatigue and abdominal cramping. (R. at 271). At that point, she was a month overdue on her annual pituitary gland brain scan.[6] (*Id.*) On May 31, 2011, she went to see Dr. Walsh complaining of high blood pressure while in her neurologist's office. (R. at 403). Plaintiff reported anxiety about her blood pressure. (*Id.*) Aside from the elevated blood pressure, the physical exam was normal, and Plaintiff did not complain

---

[4] "Tinel's sign is a way to detect irritated nerves. It is performed by lightly tapping (percussing) over the nerve to elicit a sensation of tingling or 'pins and needles' in the distribution of the nerve." <https://en.wikipedia.org/wiki/Tinel%27s_sign>

[5] Gilenya (fingolimod) is an immunosuppressant, which is used to treat relapsing MS. <www.drugs.com>

[6] In June 2011, she went to Northwestern for her follow-up MRI. (R. at 288).

of pain. On June 17, 2011, she returned complaining of a three day headache. (R. at 406). She also presented with "complaints of neck pain." (*Id.*). Her exam was otherwise normal.[7] (*Id.*)

On August 1, 2011, she was in for cellulitis on her upper right arm.[8] (R. at 415). She also complained about "an ache in the right arm" but stated the "right arm pain and weakness is being taken care of by physical therapy". (*Id.*). Plaintiff further reported that she has "pain that goes from her neck down to the forearm[,] also pain specifically localized at her lateral epicondyle and into her extensor muscles." (*Id.*) She was concerned about her growing weakness on her right side. (*Id.*). Moreover, the physical exam showed "[d]ecreased strength for the right hand grasp." (*Id.* at 416).

On September 16, 2011, Plaintiff was cleared for gastric sleeve surgery.[9] (R. at 418). In October 2011, following her lap band surgery, Plaintiff complained of panic attacks. (*Id.* at 506). She described eating and "feeling anxiety about swallowing." (*Id.*) On December 19, 2011, she was at the doctor's office because of a head cold, but

---

[7] During two visits in July 2011 for a bee sting, Plaintiff did not complain of pain. (R. at 409–14).

[8] On July 20, 2011, she presented to Wassim A. El Harake, M.D., at the Joliet Doctors Clinic for abnormal weight gain. (R. at 364). On physical exam, she had a "normal ability to concentrate." (*Id.* at 365). On August 10, 2011, she saw Dr. El Harake again and reported fatigue and weight gain. (*Id.* at 357). Her examination revealed no abnormal findings, and she had a normal "gait and station." (*Id.* at 358–59). On July 22, 2011, she went to Heartland Cardiovascular for a faster than normal heart rate. (*Id.* at 443). Seif A. Martini, M.D., switched her from lisinopril to beta blockers to "get her heart rate under better control." (*Id.* at 444). Follow-up tests produced normal results. (*Id.* at 446–47).

[9] The records for her post-operative wound care (R. at 509–16) do not reveal any complaints of hand pain and are unremarkable. The records from the surgery, conducted in Michigan, are not in the administrative file.

complained of getting "a panic attack occasionally when she eats." (*Id.* at 502). According to her, the symptoms were subsiding but the Alprazolam[10] was still necessary. (*Id.*).

On February 3, 2012, while being seen as part of a post-operative check, Plaintiff reported "muscle aches in her arms." (R. at 499). She also inquired whether it was time for a follow-up thyroid biopsy. (*Id.*).

On July 26, 2012, Plaintiff saw her treating physician about her anxiety. She described it as "a recurrent problem" with the "current episode" starting "more than 1 year ago." (R. at 490). She described the panic attacks as occurring "2 to 4 times per day [and] has been gradually worsening." (*Id.*). The examination notes indicate mild anxiety and neck tenderness along the left side. (*Id.*) The assessment concludes neck strain and adjustment disorder with anxiety.[11] (*Id.*)

On October 20, 2012, Plaintiff went to Dr. Walsh to follow-up on joint pain, anxiety, lap band procedure, and neck pain. (R. at 481). She was taking one to two Xanax pills, two times per week. (*Id.*). She reported a decreased interest in doing things like grocery shopping. (*Id.*). She did not like taking Prozac because it caused memory problems, although "she does admit this is probably due to her MS." (*Id.*). She reported "neck pain every day that goes to headaches." (*Id.*). She also said she did physical therapy in the past which "did not help." (*Id.*). She complained that her

---

[10] Xanax (alprazolam) is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. <www.drugs.com>

[11] The doctor recommended Vitamin B-12 injections and Plaintiff indicated she would call to schedule when she gets back from vacation in August. (R. at 491).

"hand[s] ache intermittently from the stiffness of her neck. The hands will also get stiff." (*Id.*).

She followed-up with John Gashkoff, M.D., of DMG Center for Pain, where she reported her pain at the time as 4 out of 10 and indicated that it began 1–2 years previously. (R. at 468–69). She reported some benefit with over-the-counter medication but the pain increased to the point of affecting her sleep. (*Id.* at 469). She reported that chiropractic care had been ineffective. (*Id.*). Dr. Gashkoff noted that she has bilateral arm pain with multi-level spondylosis/stenosis. (*Id.*). He treated Plaintiff with a cervical epidural steroid injection for pain on October 29, 2012. (*Id.* at 476).

## B. Expert Reports

On July 15, 2011, Kimberly Middleton, M.D., reviewed the medical records and examined Plaintiff at the request of the Commissioner. (R. at 332–36). Dr. Middleton found "[w]eakness in wrist flexion, biceps and triceps muscles" and determined Plaintiff was "[u]nable to perform fine and gross motor movements of both hands without modification secondary to pain and weakness." (*Id.* at 334). Dr. Middleton concluded that Plaintiff's

> right upper extremity findings [are] consistent with [Multiple Sclerosis]. Since the progression of disease varies from person to person it is difficult to predict [Plaintiff's] prognosis. However, most people with MS will have some degree of disease progression. Based on the natural history of MS, [Plaintiff's] allegations of fatigue and weakness and pain appear credible. This may directly affect her ability to sustain work on a daily basis, especially during MS exacerbations.

(*Id.* at 335).

On July 28, 2011, Kirk Boyenga, Ph.D., a nonexamining consultant, reviewed the medical records and completed a Psychiatric Review form. (R. at 337–49). Dr. Boyenga found no mental health treatment and no evidence of significant psychopathy. (*Id.* at 349). He opined that Plaintiff's allegations of depression and anxiety "cannot be considered credible" and concluded that Plaintiff has no medically determinable mental impairments. (*Id.* at 337, 349). On November 4, 2011, Lionel Hudspeth, Psy.D., another nonexamining consultant, affirmed Dr. Boyenga's findings. (*Id.* at 448–50).

On August 8, 2011, Solfia Saulog, M.D., a nonexamining consultant, reviewed the medical records and completed a Physical Residual Functional Capacity Assessment. (R. at 392–99). Dr. Saulog found Plaintiff's statements regarding weakness are partially credible "but the extent of the limitations described by [Plaintiff] in terms of fatigue [] exceeds that supported by the objective medical findings." (*Id.* at 399). Dr. Saulog concluded that Plaintiff is capable of light work with never climbing ladders, ropes and scaffolds. (*Id.* at 393–94). Plaintiff is further limited to frequent handling and fingering with her right hand. (*Id.*). On November 8, 2011, Calixto Aquino, M.D., affirmed Dr. Saulong's findings. (*Id.* at 448–50).

On October 31, 2012, Julian Freeman, M.D., a nonexamining consultant, reviewed the entire medical record on behalf of Plaintiff and opined that she met Listing 11.09C, and, in the alternative, was restricted to less than sedentary work. (R. at 464–67). Dr. Freeman is a specialist in internal medicine and neurology, with training in internal medicine, cardiology, pulmonary diseases, neurology, and radi-

ology. (*Id.* at 464). Dr. Freeman found that Plaintiff's limitations were due to "pulmonary hypertension and left arterial overload, degree of obesity, the fatigue of motor function due to the multiple sclerosis and interruption of activities due to migraines." (*Id.* at 467). The specific limitations included: (1) walking and standing about an hour per day in divided periods, (2) sitting up to six hours per day, (3) lifting, carrying, pushing, and pulling no weight frequently, and rarely 1–2 pounds, (4) rare use of the right hand with no precisely controlled use of the right hand for any purpose, (5) no repeated use of the right upper extremity, and (6) occasional interruptions due to migraines and sudden visual loss. (*Id.*).

## C. Plaintiff's Testimony

Plaintiff testified that she is unable to concentrate. (R. at 49). Because of her difficulty concentrating, Plaintiff writes everything down and makes lists and sets alarms so she does not forget. (*Id.* at 63). She often cannot recall recent, important conversations with her family. (*Id.* at 75). Plaintiff also has trouble seeing. (*Id.* at 49). Her vision is affected two to four times a week, lasting ten seconds to a few minutes, causing blurring and a "black curtain" over her left eye. (*Id.* at 68–69). Plaintiff is frequently tired and fatigued, with little energy. (*Id.* at 60, 68). She testified that she gets flu-like symptoms from her MS injections, which she receives three times a week. (*Id.* at 64).

Plaintiff has pain in both hands, which also goes up her right arm. (R. at 60). Her hand pain made it difficult for her to participate in physical therapy. (*Id.* at 61–62). She testified that her MS causes her hand to act like a "lobster claw" so she is

"always stretching out and wringing [her] hands because [she] feels like they're going to clamp up again." (*Id.* at 71–72). Plaintiff described her pain as 4/10 at the hearing, but occasionally reaches 10/10. (*Id.* at 62). She complained that the side effects from her medications "are probably worse than just living with pain." (*Id.* at 66).

Plaintiff testified to being able to sit or stand for only one hour before needing to change positions. (R. at 67–68). She used a cane at one point but stopped because of vanity and "[found] a different way." (*Id.* at 68). Plaintiff is unable to complete most household chores and has a cleaning lady to take care of most chores.[12] (*Id.* at 69–70). She is able to do a little cooking, but her family has to help lift items and place them on the table. (*Id.*). Her son drives her to most appointments, helps her to shop, and walks the dog. (*Id.* at 69–71, 73). Plaintiff's personal grooming takes a long time because she has to take frequent breaks to rest her hands. (*Id.* at 72).

Plaintiff's husband testified that she has trouble concentrating and remembering important items, and is easily fatigued. (R. at 79, 81). He stated that Plaintiff has trouble with housework and carrying things. (*Id.*). She has poor vision, including blackouts. (*Id.* at 82).

---

[12] In her May 23, 2011 Daily Activities Function Report, Plaintiff describes "a brain tumor that causes migraine headaches and causes blurred vision. But the bigger issue is my [MS]. It causes my [both] hands [sic] cramp up, pain in my arm has constant numbness and pain." (R. at 201). She reports the pain being so severe that "[she] wakes up several times from pain." (*Id.* at 202). She admits that she is able to dress, bathe, feed herself and use the toilet without assistance. (*Id.*). Washing or rinsing her hair can cause pain in her hands and blow drying and curling her hair causes them to seize up. (*Id.*). She can cook simple meals and do laundry, but she cannot carry the laundry up and down the stairs. Her children help her fold the laundry. (*Id.* at 203).

# V. DISCUSSION

On appeal, Plaintiff argues that the ALJ (1) erred in assessing Plaintiffs credibility, (2) erred in weighing the opinion evidence, and (3) failed to properly analyze Plaintiff's mental impairments. (Dkt. 17). The Court will discuss them in turn.

## A. The ALJ's Credibility Determination is Patently Wrong

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[13] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which

---

[13] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Plaintiff testified that she is unable to work because she cannot concentrate and is frequently tired and fatigued, with little energy. (R. at 49, 60, 68). Her migraine headaches cause blurry vision and a "black curtain" over her left eye. (*Id.* at 68–69, 201). She has pain in both hands, which occasionally reaches 10/10. (*Id.* at 61–62). The side effects from her medications are "worse than just living with the pain." (*Id.* at 66). Plaintiff is able to sit or stand for only one hour before needing to change po-

sitions. (*Id.* at 67–68). She is unable to complete most household chores. (*Id.* at 69–70).

In her decision, the ALJ gave Plaintiff's testimony "some weight" but did not find "the extent and the severity of [her] allegations supported in the medical evidence." (R. at 33). Specifically, the ALJ concluded:

> The record supports that [Plaintiff] is able to independently perform her daily activities. The medical records do not contain significant complaints. . . . Her lack of treatment and predominantly taking over the counter medications is indicative that her pain and symptoms were not as significant as alleged. . . .
>
> As for her neurological symptoms and conditions of numbness in her hands, multiple sclerosis, and pituitary tumor, she has had very limited treatment visits with her neurologist, which undermines her significant complaints. . . . [Plaintiff] testified to significant problems with nausea as a side effect, but the record does not support any significant problems with this treatment. This finding is further supported by her lack of calls or presentations to Dr. Itkin.
>
> The treatment record does not support ongoing presentations for headaches. The record is indicative of control with medications provided. . . .
>
> As for [Plaintiff's] allegations of fatigue, sleep issues and eye problems, the record supports some allegations of fatigue and taking Amitriptyline to help with sleep. However, there is no way to quantify this fatigue and the record does not support significant complaints or presentations for exacerbated symptoms of fatigue that would be noteworthy to support work limitations.

(*Id.* at 33–34) (citations omitted).

Under the circumstances, none of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence. Contrary to the ALJ's conclusion (R. at 34), Plaintiff's complaints of headaches are well-supported by the medical record. The ALJ acknowledged that Plaintiff's migraine headache is a severe impairment. (*Id.* at 25). Further, Plaintiff consistently

complained of migraine headaches with related dizziness and blurry vision. (*Id.* at 241 (diagnosing migraine headaches in March 2009), 243 (complaining of migraines and blurry vision in April 2009), 245 (complaining of dizziness in June 2009), 250 (complaining of headaches for two weeks in June 2010), 260 (noting a history of headaches in June 2009), 302 (noting in September 2009 that Plaintiff's pituitary adenoma could be caused by her migraines), 335 (diagnosing migraine headaches in July 2011), 406 (complaining of headaches in June 2011), 459–60 (diagnosing migraine headaches with related dizziness and vision change in April and June 2009), 468, 482 (diagnosing migraines in October 2012)). Plaintiff was prescribed multiple medications in an attempt to control her migraine headaches. (*Id.* at 257 (Topamax), 302 (Imitrex and Maxalt), 483 (Fioricet), 333 (Sumatriptan and Relpax), 460 (Topamax and Relpax)). The ALJ cannot discuss only those portions of the record that support her opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007).

Similarly, Plaintiff's complaints of fatigue are supported by the medical record. (R. at 272 (diagnosing fatigue in April 2011), 357 (complaining of fatigue in August 2011), 403, 406, 409, 412, 506 (diagnosing chronic fatigue in May, June, July, September and October 2011), 412 (complaining of fatigue in July 2011), 499 (complaining of muscle aches in February 2012), 502 (complaining of fatigue in December 2011), 468, 485, 489 (diagnosing chronic malaise and fatigue in July, September and October 2012)). Fatigue is a primary symptom of multiple sclerosis,[14] which the ALJ

---

[14] <www.mayoclinic.org/diseases-conditions/multiple-sclerosis/home/ovc-20131882>

found to be a severe impairment. (R. at 25). Indeed, in order to meet the multiple sclerosis listing, a "significant, reproducible fatigue of motor function with substantial muscle weakness" must be present. 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.09C.

The ALJ asserted that Plaintiff's fatigue could not be quantified. (R. at 34). "The ALJ must evaluate a claimant's subjective symptoms of pain and fatigue in a two-step process by first looking at medically determinable impairments that may reasonably cause the symptoms, and then considering whether those symptoms could reasonably be expected to cause limitations." *Williams v. Astrue*, 788 F. Supp. 2d 769, 777 (N.D. Ill. 2011). Here, as noted above, fatigue is a primary symptom of multiple sclerosis. Therefore, the ALJ cannot discredit Plaintiff's subjective complaints of fatigue "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562; *see Johnson*, 449 F.3d at 806 ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony.").

Dr. Middleton diagnosed multiple sclerosis with right-sided weakness and opined that Plaintiff's "allegations of fatigue, weakness and pain appear credible." (R. at 335). While the ALJ discussed Dr. Middleton's opinion (R. at 33), the ALJ erred by failing to determine the weight to give the opinion, 20 C.F.R. § 1527(c) (discussing the factors to be used to determine the weight to be given to all medical source opinions). And the ALJ failed to discuss Dr. Middleton's credibility finding. *Cf.* SSR 96-7p, at *8 (The ALJ "must consider and weigh this [credibility] opinion of

a nonexamining source under the applicable rules in 20 CFR 404.1527 and 416.927 and must explain the weight given to the opinion in the decision.").

The Commissioner argues that the ALJ could reject Dr. Middleton's credibility determination because Dr. Middleton was basing her conclusion "on the 'natural history' of multiple sclerosis rather than on an individualized assessment of [Plaintiff's] current condition." (Dkt. 25 at 4). But the ALJ did not mention this as a basis for discounting Dr. Middleton's opinion. (R. at 33). The Court must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *accord Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) ("We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly.").

The ALJ found Plaintiff's allegations incredible because of gaps in her treatment records. (R. at 34–35). "Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *see Craft*, 539 F.3d at 679 (The ALJ "must not draw any inferences" about a claimant's credibility from a failure to seek treatment "unless the ALJ has explored the claimant's explanations as to the lack of medical care.") (citation omitted); SSR 96-7p, at *7. There is some evidence that Plaintiff had no insurance and could not afford medical care. (R. at 301). "An inability to afford treatment is one reason that can provide insight into

the individual's credibility." *Craft*, 539 F.3d at 679; *see* SSR 96-7p, at *8. The ALJ is obligated to "question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." SSR 96-7p, at *7. Here, although the ALJ drew a negative inference from Plaintiff's "limited treatment visits" (R. at 34), she neither questioned Plaintiff about her lack of treatment nor explained how increased treatment visits would have improved Plaintiff's condition. *Craft*, 539 F.3d at 679 ("Here, although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine."); *Shauger*, 675 F.3d at 696 (finding that "an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects" are valid reasons for treatment gaps) (citing SSR 96-7p, at *8); *Martinez v. Astrue*, No. 10 CV 370, 2011 WL 4834252, at *8 (N.D. Ind. Oct. 11, 2011) (The ALJ may consider conservative treatment in assessing the severity of a condition, but should cite medical evidence about what kind of treatment would be appropriate.") (citations omitted).

Finally, the ALJ failed to take into account that Plaintiff's medications were causing intolerable side effects. SSR 96-7p, at *8 ("The individual may not take prescription medication because the side effects are less tolerable than the symptoms."). Contrary to the ALJ's contention that the record does not contain evidence

of side effects (R. at 34), Plaintiff consistently complained about nausea and flu-like symptoms from her Rebif injections (*id.* at 332 (complaining to Dr. Middleton about Rebif side effects), 499 (complaining of nausea), 506 (same)).

The Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## B. The ALJ's Decision Giving Dr. Freeman's Opinion "No Weight" is Supported by Substantial Evidence

In October 2012, Dr. Freeman, a specialist in internal medicine and neurology, reviewed the medical record and opined that Plaintiff met Listing 11.09C, and, in the alternative, was restricted to less than sedentary work. (R. at 464–67). Dr. Freeman found that Plaintiff's limitations were due to "pulmonary hypertension and left arterial overload, degree of obesity, the fatigue of motor function due to the multiple sclerosis and interruption of activities due to migraines." (*Id.* at 467).

The ALJ gave Dr. Freeman's opinion "no weight":

> Dr. Freeman opined that [Plaintiff] meets Listing 11.09(c). However, Dr. Freeman did not have the opportunity to review all of the evidence because additional evidence was received after his opinion was rendered. The additional medical evidence supports that [Plaintiff] is doing much better than Dr. Freeman opines. The medical evidence that Dr. Freeman reviewed was minimal. Specifically, he found that she met Listing 14.09 [*sic*] as of July 2011. However, the medical evidence in the file at that time, and the evidence that he considered in support of a finding of disability only covered a few months—namely, approximately July 2011 to September 2011. Much of [Plaintiff's] treatment for her symptoms applies after October of 2012.

\*     \*     \*

I also give no weight to the functional capacity assessment of Dr. Freeman. Dr. Freeman again did not examine [Plaintiff] and did not review the entire medical evidence that fails to support his extensive limitations. Dr. Freeman opined that [Plaintiff] should be reduced to less than sedentary work with standing one hour a day for brief and divided periods, sitting for six hours a day with rare postural changes with lifting or carrying one to two pound. The treatment record that Dr. Freeman reviewed does not support these extensive limitations. [Plaintiff] did not go for any ongoing treatment to support these physical functional limitations. She was taking over the counter pain medications until October of 2012. Hence, her pain management was indicative of control with minimal medications. Dr. Freeman opined that [Plaintiff] should rarely use her right hand with no repeated or rapidly alternating use of the right upper extremity. However, in October of 2012, the treatment record shows that she was well coordinated and she was able to engage in rapid alternating movements with her upper extremities. Hence, I find this finding contrary to Dr. Freeman's opinion.

Dr. Freeman indicated that [Plaintiff] should have occasional interruptions of activity due to migraines and sudden visual loss. I find this limitation inconsistent with Dr. Freeman's earlier notation that there is [a] lack of information on frequency of migraines in the record. I note that the medical information does not support ongoing visits for migraines or vision problems. It appears that her migraines are controlled with the Imitrex prescribed as needed. There are no ophthalmological exams to support ongoing vision problems. Dr. Freeman further opined that [Plaintiff] should not climb ladders, ropes or scaffolds with no walking on uneven or slippery surfaces or precise balance. [Plaintiff] has consistently had a normal gait in the treatment record. The record does not support her need of any assistive device despite [Plaintiff] reporting that she used one on occasion, but no longer. Furthermore, [Plaintiff] testified to no problems with walking. . . . The treatment record that Dr. Freeman perused for his opinion shows various diagnoses and testing but no real ongoing treatment or visits for ongoing complaints from her medical conditions.

(R. at 28, 35–36) (citations omitted).

Plaintiff contends that the ALJ erred in giving no weight to Dr. Freeman's opinion. (Dkt. 17 at 15–17). She argues that the ALJ simply disagreed with Dr. Freeman's opinion without providing medical support for his decision. (*Id.* at 15). The

opinion of a doctor who has examined the claimant is generally entitled to more weight than a nonexamining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Thus, opinions by nonexamining sources are evaluated to the extent that they "consider all of the pertinent evidence in [the record], including opinions of treating and other examining sources." *Id.*

After careful review, the Court finds that the ALJ supported her decision giving no weight to Dr. Freeman's decision with substantial evidence. First, Dr. Freeman's opinion is largely based on his evaluation of medical records over a three-month period, from July through September 2011. (R. at 464–65). Second, Dr. Freeman's opinion is inconsistent with the medical record and not supported by diagnostic evidence. (*Id.* at 35–36). For example, contrary to Dr. Freeman's opinion limiting Plaintiff from performing any fine or gross motor functions with her right hand (*id.* at 466), a November 2011 EMG of Plaintiff's upper extremities indicated normal findings with no cervical radiculopathy, neuropathy, or carpal tunnel syndrome (*id.* at 461–62). Physical examinations in April 2011, July 2011, and October 2012 found normal gait, normal movements of all extremities, normal muscle strength and tone, full range of motion of all joints, and full coordination of the upper extremities. (*Id.* at 272, 334, 472). In October 2012, Plaintiff was able to move independently from sitting to standing, engage in rapid alternating movements of her upper extremities bilaterally, and tandem walk. (*Id.* at 471–72). Her treating physician encouraged physical activity and advised Plaintiff to continue normal activities. (*Id.* at 472). Plaintiff testified that she could walk without difficulty. (*Id.* at 68). As the ALJ

observed, all these records contradict Dr. Freeman's opinion that Plaintiff cannot walk on slippery or uneven surfaces. (*Id.* at 36, 467).

Finally, the ALJ found that Dr. Freeman's opinion was internally inconsistent. (R. at 36); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (ALJ can discount medical opinion if it is internally inconsistent). While Dr. Freeman found a lack of information in the record about frequency of migraines (R. at 465), he nevertheless opined that Plaintiff would have interruptions of activity because of migraines (*id.* at 467). "[I]f the ALJ finds that the opinion is internally inconsistent or contradicted by other evidence, she may discount it, as long as she provides an adequate explanation for doing so." *Carter v. Astrue*, 413 F. App'x 899, 905 (7th Cir. 2011).

Plaintiff contends that the ALJ failed to explicitly discuss the checklist of factors required for evaluating medical opinions. (Dkt. 17 at 16). The regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss*, 555 F.3d at 561; 20 C.F.R. §§ 404.1527(c), 416.927(c). While the ALJ did not acknowledge Dr. Freeman's specialties in internal medicine and neurology, she thoroughly examined how Dr. Freeman's opinion was inconsistent with and not supported by the overall medical record. (R. at 28, 36–37). "[B]ecause nonexamining sources have no examining or treating relationship with [the claimant], the weight [given] their opinions will de-

pend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

## C. The ALJ's Mental Impairment Determination is Supported by Substantial Evidence

After reviewing the medical record, the ALJ determined that Plaintiff has a medically determinable mental impairment of adjustment disorder with anxiety, which results in mild limitations in activities of daily living, social functioning, and concentration, persistence or pace. (R. at 26–27). The ALJ found that Plaintiff has not suffered any episodes of decompensation. (*Id.* at 27). Accordingly, the ALJ concluded that Plaintiff's "adjustment disorder with anxiety does not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and is therefore nonsevere." (*Id.* at 26).

Plaintiff contends that the ALJ made an independent medical determination as to the severity of her mental impairments without consulting a medical expert. (Dkt. 17 at 18). On the contrary, the ALJ relied on the medical records in determining that Plaintiff's mental impairment "does not support any more than minimal effect on [her] ability to work." (R. at 26). In August 2011, Dr. El Harake noted no psychiatric symptoms and found, after performing a neuropsychiatric examination, that Plaintiff demonstrates appropriate judgment and insight, normal attention span, concentration, mood and affect. (*Id.* at 357–58). While Plaintiff started taking Xanax and Prozac in 2012, she uses them infrequently and denies depression symptoms. (*Id.* at 481, 484, 486, 499).

While Plaintiff testified to poor memory and concentration, at her July 2011 medical examination, Dr. Middleton found Plaintiff's communication skills, recent and remote memory, insight and judgment all well within normal limits. (R. at 334). In August 2011, Dr. El Harake found Plaintiff to be alert and oriented with no impairment of recent or remote memory, and an appropriate fund of knowledge. (*Id.* at 358). In September 2011, Plaintiff's judgment, insight, mood and affect were normal and she was oriented to person, place and time. (*Id.* at 421).

Plaintiff argues that the ALJ should have incorporated her mild mental limitations into the RFC. (Dkt. 17 at 19). However, "a mild, or even a moderate, limitation in an area of mental functioning does not prevent an individual from functioning satisfactorily." *Sawyer v. Colvin*, 512 F. App'x 603, 611 (7th Cir. 2013) (citation omitted). And Plaintiff has not identified any medical evidence that demonstrates how her mental impairment limits her ability to work. (Dkt. 17 at 17–20); *see* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.").

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse is **GRANTED**, and Defendant's Motion for Summary Judgment [24] is **DENIED**. Pursuant to sentence

four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTER:

Dated: November 9, 2015

MARY M. ROWLAND
United States Magistrate Judge